1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11    VIRGIL E. HOLT,                          )    Case No.: 1:09-cv-00800-AWI-SAB (PC)
                                               )
12                  Plaintiff,                 )    FINDINGS AND RECOMMENDATIONS
                                               )    REGARDING DEFENDANTS' MOTION FOR
13           v.                                )    SUMMARY JUDGMENT
                                               )
14    R. NICHOLAS, et al.,                     )    [ECF Nos. 123, 138]
                                               )
15                  Defendants.                )
                                               )
16    _____      )

17           Plaintiff Virgil E. Holt is appearing pro se and in forma pauperis in this civil rights action

18    pursuant to 42 U.S.C. § 1983.

19                                              **I.**

20                                        **BACKGROUND**

21           This action is proceeding on Plaintiff's second amended complaint against Defendants R.

22    Nicholas, A. Holguin, J. Ortega, L. Machado, J. Juden, G. Adame, F. Rivera, R. Valverde, D. Cootnz,

23    M. Bubbel, K. Prior, J. Tyree, Large, Soto, Yuberta, Worrell, Vo, Knight, T. Crouch, Pinkerton,

24    Velasco for violation of the Eighth Amendment, and against Defendants Carrasco and D. Zanchi for

25    supervisory liability.

26           Now pending before the Court is Defendants' motion for summary judgment filed April 30,

27    2014.  Plaintiff filed an opposition on August 18, 2014.

28

                                                1

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)). If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), cert. denied, 132 S.Ct. 1566

(2012).  The Court determines *only* whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

### III.

### DISCUSSION

#### A.      Plaintiff's Allegations[1]

In the second amended complaint, Plaintiff contends on or about April 9, 2007, Plaintiff was sitting on his bunk when he heard the sound of officers running towards Plaintiff's cell.  Plaintiff's cell mate was attempting to flush pruno down the toilet.  Defendants Nichols, Holguin, and Ortega appeared at Plaintiff's cell door, and Defendants Nicholas and Holguin began to spray Plaintiff's cell with pepper spray.  Defendants ordered Plaintiff and his cell mate to get down and cuff up.  Plaintiff and his cell mate complied, but Defendants Nichols and Holguin continued to spray Plaintiff with pepper spray.  Defendant Ortega then told Defendant Holguin to deploy a T-16 pepper spray gas grenade into the cell despite Plaintiff and his cell mate being prone on the floor.  Plaintiff and his cell mate were in the cell for two minutes for the pepper spray grenade to take effect.  Plaintiff had difficulty breathing, and his skin was burning so severely he felt like it was melting.

Defendants Holguin and Nicholas wrote incident and rules violation reports charging Plaintiff with resisting a peace officer.  Defendants Machado and Juden stood by and did nothing to intervene as Defendants Nicholas, Holguin, and Ortega applied the unnecessary use of chemical force.  Defendant Machado ordered Plaintiff to remove his clothes and crawl backwards towards the cell door.  Defendants Machado and Juden dragged Plaintiff out of his cell by his ankles, scraping the skin off both of Plaintiff's knees.  Defendant Nicholas then threatened to shoot someone; Plaintiff assumes

---

[1] Plaintiff's second amended complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence.  Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004).  The summarization of Plaintiff's claim in this section should not be viewed by the parties as a ruling that the allegations are admissible.  The Court will address, to the extent necessary, the admissibility of Plaintiff's evidence in the sections which follow.

this was because of hostility towards black inmates because of attempted assault on a correctional officer by a black inmate.

Plaintiff alleges Defendants Carrasco and Zanchi authorized the use of force against Plaintiff. Defendants Carrasco and Zanchi were aware of the abusive conduct and prior acts of excessive force by Defendants Nicholas and Holguin against inmates but repeatedly failed to take corrective action against them or control their behavior.

Plaintiff asked Defendants Machado, Juden, Ortega, Nicholas, and Holguin to provide him with decontamination, but they ignored Plaintiff. Plaintiff was escorted outside the housing unit by Defendant Valverde. Plaintiff informed Defendant Valverde that he had been pepper-sprayed and had not been decontaminated, and had difficulty breathing and was severely burning. Defendant Valverde ordered Plaintiff to the ground, and stated that if Plaintiff moved, he would bash Plaintiff's head in. Defendant Valverde ignored Plaintiff's request for decontamination.

Plaintiff and his cell mate were escorted to the clinic holding cell, where the sink was clogged and filled to the rim with foul water, and the faucet head was under the rim of the sink. Plaintiff informed Defendants Rivera, Adame, Valverde, and Coontz upon their entering the holding area that the sink was clogged and Plaintiff needed to decontaminate. Defendants ignored Plaintiff's request.

After Plaintiff's requests for decontamination were ignored, he was seen by Defendant Bubbel for a medical incident/injury review report. Plaintiff informed Defendant Bubbel that he had been pepper-sprayed and was in need of decontamination. Defendant Bubbel ignored Plaintiff's request and did nothing to provide Plaintiff with any medical attention. Plaintiff saw Defendant Vo enter the clinic area and informed him that he had been pepper sprayed and was in need of decontamination. Defendant Vo ignored Plaintiff's request.

Plaintiff was interviewed later that afternoon by Defendants Crouch, Tyree, and Hopkins. Plaintiff informed them he had not been decontaminated, and that the use of pepper spray and grenade in the morning was severely burning him. After finishing their investigation, Defendants left the clinic holding area and did nothing to provide Plaintiff with decontamination.

After several hours without decontamination, Plaintiff began to scream in agony, and other inmates yelled for someone to provide assistance. Defendants Knight, Pinkerton, and Velasco

4

eventually responded and Plaintiff informed them he was in need of decontamination.  Defendants ignored Plaintiff's request for assistance.

Defendants Worrell, Soto, Yubeta, and Large went to the clinic holding area to find out why Plaintiff was screaming.  Plaintiff showed Defendants that his skin was purplish, burgundy in color from the exposure to the pepper spray without decontamination.  Defendants ignored Plaintiff's request; Defendant Soto told Plaintiff he should use the toilet water if he wished to decontaminate.  Plaintiff and his cell mate had no clothing.

At approximately 9:00 p.m., Defendant Prior entered the clinic holding area.  Defendant Prior ordered Plaintiff and his cellmate to receive some paper boxers.  Plaintiff requested that he be provided with decontamination, but Defendant Prior ignored the request.

Plaintiff was later placed into administrative segregation.  Plaintiff spent the night sleeping in his contaminated clothing, which caused his mattress and bedding to be covered in chemical agents.  The next day, Plaintiff was provided a ten-minute shower.  Despite his request, Plaintiff was not provided new linens and had to sleep in the contaminated conditions until April 19, 2007.

Plaintiff submitted a medical request on April 11, 2007, to Defendant Vo, because his skin had begun to blister and peel.  Plaintiff's request was ignored.  Plaintiff alleges supervisory liability against Defendants Carrasco and Zanchi for authorizing the use of force and failing to supervise, resulting in Plaintiff's exposure to chemical agents for ten days.

**B.**     **Statement of Undisputed Facts[2]**

**Background Facts**

1.     Plaintiff, Virgil Holt, is an inmate in the custody of the California Department of Corrections and Rehabilitations (CDCR).

2.     At all times relevant to this suit, Plaintiff was incarcerated at the California Correctional Institution (CCI) in Tehachapi, California.

3.     Plaintiff does not have any medical training.

---

[2] The factual statements are derived from Defendants' statement of undisputed facts where not disputed by Plaintiff.  To the extent facts are omitted, the determination whether such fact is disputed by sufficient evidence to prevent summary judgment will be discussed below.

4. At all times relevant to this suit, Adame was a Search and Escort Officer at CCI.

5. At all times relevant to this suit, Bubbel was a Medical Technical Assistant at CCI. Bubbel has been a Licensed Vocational Nurse since 1993.

6. At all times relevant to this suit, Carrasco was an Associate Warden at CCI.

7. At all times relevant to this suit, Coontz was a Correctional Officer at CCI.

8. At all times relevant to this suit, Crouch was a Correctional Officer at CCI.

9. At all times relevant to this suit, Holguin was a Correctional Officer at CCI.

10. At all times relevant to this suit, Juden was a Correctional Officer at CCI.

11. At all times relevant to this suit, Knight was a Correctional Officer at CCI.

12. At all times relevant to this suit, Large was a Correctional Officer at CCI.

13. At all times relevant to this suit, Machado was a Sergeant at CCI.

14. At all times relevant to this suit, Nicholas was a Correctional Officer at CCI.

15. At all times relevant to this suit, Ortegas was a Sergeant at CCI.

16. At all times relevant to this suit, Pinkerton was a Correctional Officer at CCI.

17. At all times relevant to this suit, Prior was a Lieutenant at CCI.

18. At all times relevant to this suit, Rivera was a Search and Escort Officer at CCI.

19. At all times relevant to this suit, Soto was a Sergeant at CCI.

20. At all times relevant to this suit, Tyree was the Assistant Institutional Gang Investigator at CCI.

21. At all times relevant to this suit, Vo was a Staff Physician at CCI.

22. At all times relevant to this suit, Valverde was a Correctional Officer at CCI.

23. At all times relevant to this suit, Velasco was a Correctional Officer at CCI.

24. At all times relevant to this suit, Worrell was a Correctional Officer at CCI.

25. At all times relevant to this suit, Yubeta was a Sergeant at CCI.

26. At all times relevant to this suit, Zanchi was a Facility Captain at CCI.

**Facts Relating to Supervisory Liability Claims Against Carrasco and Zanchi**

27. Plaintiff did not speak with Carrasco on April 9, 2007.

28. Plaintiff did not speak with Zanchi on April 9, 2007.

6

29.     Carrasco and Zanchi did not observe or participate in either the use of O.C. pepper spray or decontamination of Plaintiff on April 9, 2007.[3]

30.     Carrasco and Zanchi did not observe or participate in either the use of O.C. pepper spray or decontamination of Plaintiff on April 9, 2007.

31.     Between April 9, 2007, and April 19, 2007, Carrasco was not aware of anyone that failed to properly decontaminate Plaintiff, and she did not believe, or have any reason to believe, that anyone would refuse to properly decontaminate Plaintiff.[4]

32.     Between April 9, 2007, and April 19, 2007, Zanchi was not aware of anyone that failed to properly decontaminate Plaintiff, and he did not believe, or have any reason to believe, that anyone would refuse to properly decontaminate Plaintiff.[5]

**Facts Relating to Plaintiff's Exposure to O.C. Pepper Spray on April 9, 2007**

**a.      Facts Relating to Defendants Holguin and Nicholas**

33.     On April 9, 2007, Plaintiff occupied Housing Unit 3, Section B, cell 102 with inmate Jarvis Garner.

34.     Pruno is inmate-manufactured alcohol.

35.     Pruno is made by fermenting fruit.[6]

36.     Manufacturing alcohol inside a cell is a violation of prison rules.[7]

---

[3] Plaintiff attempts to dispute this fact by claiming that Defendants Carrasco and Zanchi authorized, ordered, and oversaw the operations on April 9, 2007, and ordered Defendants Nicholas and Holguin to spray anyone flushing items down the toilet, but failed to supervise these Defendants.  However, Plaintiff overlooks the fact that in the Court's Findings and Recommendations (adopted in full) screening Plaintiff's second amended complaint, the Court found that Plaintiff stated a cognizable supervisory liability claim against Defendants Holguin and Nicholas's for having knowledge of their history of excessive force against inmates and failure to discipline them.  (Findings and Recommendations at 10, ECF No. 23.)  The Court specifically found that Plaintiff *did not* state a cognizable supervisory liability claim for authorizing use of force and failing to supervise.  (Id.)  Accordingly, this fact is undisputed.

[4] For the same reasons set forth above in footnote 3, this fact is undisputed.

[5] For the same reasons set forth above in footnote 3, this fact is undisputed.

[6] Plaintiff attempts to dispute this fact by stating "a kicker contains no alcohol and is one of several ingredients used to make pruno."  However, such factual contention does not place this fact in dispute as it makes reference to pruno not a "kicker".

[7] Plaintiff disputes Defendants' contention that possessing fruit inside a cell is a rules violation.  To the extent such contention is correct, the Court has omitted that fact as being undisputed.

37.     Between approximately April 1, 2007, and April 9, 2007, Plaintiff and inmate Garner fermented fruit to make pruno.

38.     The "kicker" was stored in approximately five "snack sized" potato chip bags.[8]

39.     The potato chip bags were about the size of a grapefruit.  Because the bags were not transparent, correctional staff could not see through them.[9]

40.     Before staff arrived at cell 102, Plaintiff and Garner could hear staff running toward their cell.

41.      On April 9, 2007, Nicholas and Holguin participated in a series of cell searches in Housing Unit 3, Section B.[10]

42.     On this date, Holguin and Nicholas were attempting to discover and confiscate inmate-manufactured weapons, other contraband, and evidence that prison disruptive groups or prison gangs were planning violence against inmates or staff.[11]

43.     Holguin and Nicholas were aware of numerous instances where inmates possessed notes in their cells regarding plans by prison disruptive groups or prison gangs to commit acts of violence and the identity of intended targets.[12]

---

[8] Plaintiff disputes the fact that "pruno" was found in his cell, and contends it was only "kicker" which is fermented fruit used to make pruno.  Because the determination of whether it was pruno or kicker is not dispositive in this case, the Court replaces pruno with kicker.

[9] Plaintiff attempts to dispute this fact by stating "Defendants Holguin and Nicholas could see that plaintiff's cellie was attempting to dump kicker into the toilet."  Plaintiff misstates  Defendants' statement.  Defendants statement is only that Defendants could not see through the baggies, not that they could not see he was attempting to flush something down the toilet.

[10] Plaintiff attempts to dispute this fact by claiming that Defendants Nicholas and Holguin participated in a series of undocumented (and illegal) calculated uses of force of every black inmate in Housing Unit 3.  Plaintiff is attempting to add more facts, which does not bring this fact into dispute.

[11] Plaintiff purports to dispute this fact, but his dispute is based on his attempt to add more facts, which does not bring this fact into dispute.

[12] Plaintiff purports to dispute this fact, but his dispute is based on his attempt to add more facts, which does not bring this fact into dispute.

44.   Inmates that are not members of prison disruptive groups or prison gangs will also receive the notes due to both recruitment efforts and the spread of information between inmates.

45.   The toilet in cell 102 is located near the cell door.

46.   Garner ignored Holguin and Nicholas' orders and continued to flush items down the toilet.[13]

47.   During their employment with CDCR, Holguin and Nicholas have used O.C. pepper spray, and observed correctional staff use O.C. pepper-spray on inmates.  On each occasion where they have used O.C. pepper spray, or observed correctional staff use O.C. pepper spray on an inmate, the inmate had trouble seeing, opening his eyes, and breathing, he experienced a burning sensation in his eyes, and he was disoriented; but within approximately forty-five minutes, all of the inmate's symptoms resolved.[14]

48.   As Nicholas and Holguin were spraying, they both continued to order Plaintiff and inmate Garner to stop what they were doing and get down on the ground.[15]

49.   Plaintiff was sitting in the back of the cell.

50.   After Nicholas and Holguin began to use O.C. pepper spray, inmate Garner returned to the locker where the kicker was stored, retrieved another bag of kicker, and dumped it into the toilet.[16]

---

[13] Plaintiff attempts to dispute this fact by stating there was no pruno just fermenting fruit kicker and Garner was attempting to flush kicker.  Plaintiff does not call into dispute the substance of this fact that Garner was attempting to flush items down the toilet and ignored orders.

[14] Plaintiff attempts to dispute this fact by stating that he had an adverse reaction to the combined chemical agents.  This fact is not specific to Plaintiff's symptoms following the use of chemical agents, but rather a statement of general observations on prior occasions.  The symptoms that Plaintiff suffered after use of the chemical agents on the date in question remains disputed.

[15] Plaintiff attempts to dispute this fact by claiming when Nicholas and Holguin began spraying into the cell and at Plaintiff, he had not done anything wrong and had not done anything to assist Garner.  This factual statement does not place Defendants' statement in dispute because Plaintiff's actions are irrelevant to this statement as to whether he was ordered to get down.

[16] Plaintiff attempts to dispute this fact by claiming inmate Garner was trying to get rid of kicker, not pruno.  As previously stated the fact whether the item was kicker or pruno is not dispositive, and the Court will therefore substitute kicker in place of pruno.

9

51.   As Nicholas and Holguin were spraying inmate Garner, Plaintiff could hear staff yelling, "Cuff up.  Get down."[17]

52.   Plaintiff "didn't register" that staff were ordering him to get down on the ground until after he was exposed to O.C. pepper spray.[18]

53.   Garner stopped flushing the bags and ran toward Plaintiff at the back of the cell.[19]

54.   Garner dove and hid underneath a locker inside the cell.

55.   Plaintiff was exposed to O.C. pepper spray for approximately two to three minutes before he exited the cell 102.

56.   Holguin did not encounter Plaintiff in the clinic holding area.

**b.      Facts Relating to Defendant Ortega**

57.   Ortega observed Nicholas and Holguin's interaction with Plaintiff and inmate Garner and provided additional security and support.

58.   Ortega did not encounter Plaintiff in the clinic holding area.

**c.      Facts Relating to Defendants Machado and Juden**

59.   Juden did not encounter Plaintiff in the clinic holding area.

60.   Machado did not encounter Plaintiff in the clinic holding area.

61.   The doorway to cell 102 is approximately three feet wide.

62.   After being pulled out the doorway, Plaintiff had a scrape or "raspberry" about the size of a dime or nickel on each knee.

63.   The minor scrapes to Plaintiff's knees did not require any medical treatment.

---

[17] Plaintiff attempts to dispute this fact by stating neither Defendant addressed Plaintiff by name, and they did not begin to issue orders until after they began spraying inside the cell.  Plaintiff's statement does not place this factual statement in dispute as it is not in conflict with Defendants' statement.

[18] Plaintiff attempts to dispute this fact by stating Nicholas and Holguin didn't begin to issue orders to Plaintiff until after they started to spray him, and Plaintiff was never addressed directly by name.  Plaintiff's factual contention does not contradict Defendants' statement.

[19] Plaintiff attempts to dispute this fact claiming he dropped a bag of kicker, took 1 ½ steps toward back of cell and dove into an unobscured space underneath the locker.  Plaintiff's statement does not contradict Defendants' statement.

**d.      Facts Regarding the Procedures for Decontaminating Inmates Exposed to O.C. Pepper Spray**

64.    An individual who is exposed to O.C. pepper-spray will typically experience coughing, gagging, shortness of breath, and a burning sensation to the eyes and skin.  These symptoms should resolve within forty-five minutes after exposure.[20]

65.    Staff are trained to know that symptoms should typically resolve within 45 minutes.

66.    Water and other liquids can reactivate the dried O.C. pepper-spray residue and cause an additional burning sensation.

67.    Air decontamination ensures the individual exposed to O.C. pepper spray has the opportunity to resume breathing normally.  The individual should be escorted away from the immediate area where O.C. pepper spray was dispersed and provided fresh air.[21]

68.    The fresh air portion of CDCR's decontamination procedure concerns an individual's respiratory system, not the burning sensation on his skin or any residual burning that could be caused by rewetting the O.C. pepper spray.[22]

**e.      Facts Regarding Plaintiff's Claims that Defendants Adame, Bubbel, Coontz, Crouch, Knight, Large, Pinkerton, Prior, Rivera, Soto, Tyree, Valverde, Velasco, Vo, Worell, and Yubeta Refused to Provide him with Decontamination for Exposure to O.C. Pepper Spray**

69.    Plaintiff does not have asthma or any other difficulty breathing normally.

**Defendants Adame and Rivera**

70.    Valverde escorted Plaintiff out of Housing Unit Three, Section B.

---

[20] Plaintiff attempts to dispute this fact by stating that he had an adverse reaction to the combined chemical agents.  This fact is not specific to Plaintiff's symptoms following the use of chemical agents, but rather a statement of general observations.  The symptoms that Plaintiff suffered after use of the chemical agents on the date in question remains disputed.

[21] Plaintiff attempts to dispute this fact by stating that exposure to a dry powdery T-16 requires more than fresh moving air.  Plaintiff's statement does not place Defendants' statement relating to air decontamination, generally, in dispute.

[22] Plaintiff attempts to dispute this fact stating he was not provided any decontamination.  Plaintiff's statement does not contradict Defendants' statement.

71.     Plaintiff was escorted by Adame and Rivera from the outside of Housing Unit Three, Section B, to the clinic holding area.

72.     Plaintiff told Adame and Rivera, "They ain't give me no decontamination, man.  This stuff is still burning me.  Man, I need some decontamination.  Somebody do something."

73.     Adame and Rivera placed Plaintiff in holding cell number 122.

74.     There is a sink in holding cell 122.  The sink was clogged with brown water.

**Defendant Bubbel**

75.     On April 9, 2007, Bubbel was assigned to report to the 4A clinic holding area to examine several inmates, including Plaintiff, for exposure to O.C. pepper spray.[23]

76.     Prior to the examination, Bubbel was advised that Plaintiff was exposed to O.C. pepper spray.[24]

77.     Plaintiff told Bubbel, "Man, we've been sprayed with this pepper spray.  Man, we need some decontamination.  Man, this stuff is burning."

78.     Bubbel observed that Plaintiff had minor scrapes to both knees, but no other injuries.

**Defendant Velasco**

79.     While Plaintiff was in the holding cell, he was observed by Defendant Velasco from a control booth nearby.

**Defendant Vo**

80.     Shortly after Plaintiff was examined by Bubbel, Plaintiff told Vo that, "He hadn't been decontaminated, that the stuff was burning me.  I told him I felt sic because I had swallowed some of the pepper spray.  I told him that it felt like my skin was melting."

**Defendant Valverde**

---

[23] Plaintiff purports to dispute this fact, but his dispute is based on his attempt to add more facts, which does not bring this fact into dispute.

[24] Plaintiff disputes the timing that Bubbel was advised that Plaintiff was exposed to O.C. pepper spray.  Therefore, the Court omitted only the reference to the time.

81. When Valverde entered the clinic holding area, Plaintiff told him, "They ain't give me no decontamination, man.  This stuff is still burning me.  Man, I need some decontamination.  Somebody do something."

**Defendant Coontz**

82. When Coontz entered the clinic holding area, Plaintiff told him, "They ain't give me no decontamination, man.  This stuff is still burning me.  Man, I need some decontamination.  Somebody do something.

**Defendants Tyree and Crouch**

83. As part of their duties, Tyree and Crouch took photographs of inmates in the clinic holding area to document both the presence and absence of gang tattoos.

84. Plaintiff told Tyree, "We was still burning from the pepper spray, and that we hadn't been decontaminated, that we needed decontamination.

**Defendant Knight**

85. Plaintiff requested decontamination from Knight.

**Defendant Pinkerton**

86. Plaintiff requested decontamination from Pinkerton.

**Defendants Large, Soto, Worrell and Yubeta**

87. Plaintiff requested decontamination from Large, Soto, Worrell, and Yubeta.  Plaintiff told Large, Soto, Yubeta and Worrell that his sink was clogged and his skin had become discolored.

**Defendant Prior**

88. Plaintiff requested decontamination from Prior.

**Facts Regarding Plaintiff's Decontamination in the Administrative Segregation Unit**

89. Between April 9, 2007, and April 19, 2007, Plaintiff did not encounter Defendants in the Administrative Segregation Unit at CCI.[25]

---

[25] Plaintiff attempts to dispute this fact by stating that just prior to his transfer and placement in the administrative segregation unit, Defendant Prior refused decontamination and failed to ensure such decontamination in segregation, however, Plaintiff's statement does not contradict Defendants' statement and place it in dispute.

90.     On April 11, 2007, Plaintiff submitted a request for healthcare services, addressed to Defendant Vo, that indicated his skin had begun to blister and peel.

**Facts Regarding Plaintiff's Claims for Injunctive Relief**

91.     Currently, Plaintiff is incarcerated at California State Prison – Los Angeles.

92.     Adame does not work at California State Prison – Los Angeles, and he does not have authority or control over Plaintiff.

93.     Bubbel does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

94.     Carrasco does not work at California State Prison – Los Angeles, and she does not have any authority or control over Plaintiff.

95.     Coontz does not work at California State Prison – Los Angeles, and she does not have any authority or control over Plaintiff.

96.     Crouch does not work at California State Prison – Los Angeles, and he does not have authority or control over Plaintiff.

97.     Holguin does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

98.     Juden does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

99.     Knight does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

100.    Large does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

101.    Machado does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

102.    Nicholas does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

103.    Ortega does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

14

104.   Pinkerton does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

105.   Prior does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

106.   Rivera does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

107.   Soto does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

108.   Tyree does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

109.   Valverde does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

110.   Velasco does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

111.   Vo does not work at California State Prison – Los Angeles, and he does not have any authority or control over Plaintiff.

**C.     Analysis**

1.     Eighth Amendment Use of Force Claims

**a.     Supervisory Liability Claim Against Defendants Carrasco and Zanchi**

Supervisory personnel may not be held liable under section 1983 for the actions of subordinate employees based on *respondeat superior*, or vicarious liability.  Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir. 2013); accord Lemire v. California Dep't of Corr. and Rehab., 726 F.3d 1062, 1074-75 (9th Cir. 2013); Lacey v. Maricopa County, 693 F.3d 896, 915-16 (9th Cir. 2012) (en banc).  "A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  Crowley, 734 F.3d at 977 (citing Snow, 681 F.3d at 989) (internal quotation marks omitted); accord Lemire, 726 F.3d at 1074-75; Lacey, 693 F.3d at 915-16.  "Under the latter theory, supervisory liability exists even without overt personal participation in the offensive act if

15

supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation." Crowley, 734 F.3d at 977 (citing Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989)) (internal quotation marks omitted).

In this instance, Defendant Carrasco was an Associate Warden at CCI, and Defendant Zanchi was a Facility Captain. Plaintiff contends that Carrasco and Zanchi were "aware of, and had been placed on notice of, the abusive conduct and prior acts of excessive force of defendants R. Nicholas and A. Holguin against inmates, by numerous complaints and grievances of the previous months and years but have repeatedly failed to take corrective or disciplinary action against them or otherwise control their behavior." (2nd Amd. Compl. at 11 ¶ 58; ECF No. 21.)

Pursuant to this Court's screening order, the only claim found to be cognizable against Defendants Carrasco and Zanchi is "for having knowledge of Defendant Holguin and Nicholas's history of excessive force against inmates and failing to discipline them." (F&R at 10; ECF No. 23.) It was specifically noted, contrary to both parties briefing of the present motion, that Plaintiff *did not* state a cognizable supervisory liability claim for authorizing use of force and failing to supervise. (Id.) (Emphasis added).

Plaintiff has not meet his burden of demonstrating a supervisory liability claim based on the failure to discipline Defendant Holguin and Nicholas's for use of excessive force, in that there is no evidence to suggest that either Defendant Holguin and/or Nicholas's had a history of excessive use of force, so as to support the allegation that Defendants Carrasco and Zanchi knew of such alleged history and failed to take corrective action**.** See Hydrick v. Hunter, 669 F.3d 937 (9th Cir. 2012) (Ninth Circuit observed that there can be no supervisory liability claim if the plaintiff made no allegation of a specific policy implemented by the Defendants or a specific event or events instigated by the Defendants that led to the purported constitutional violations.)

Nor is there any evidence to find that either Carrasco or Zanchi believed, nor have any reason to believe, that Nicholas, Holguin, or anyone else posed a threat of harm to Plaintiff. They did not believe, or have any reason to believe, that anyone would use excessive force against Plaintiff, or refuse to properly decontaminate Plaintiff from exposure to O.C. pepper spray. Thus, Carrasco and Zanchi are entitled to summary judgment because Plaintiff seeks to hold them liable for conduct of

16

their subordinates based solely on a theory of respondeat superior, which is not cognizable.  A causal link between a supervisor and the claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979).  Because of this finding, the Court need not and does not address the alternative argument that Defendants Carrasco and Zanchi are entitled to qualified immunity.

> **b.**    **Alleged Use of Force by Defendants Nicholas and Holguin**

The unnecessary and wanton infliction of pain violates the Cruel and Unusual Punishments Clause of the Eighth Amendment.  Hudson v. McMillian, 503 U.S. 1, 5 (1992) (citations omitted).  For claims arising out of the use of excessive physical force, the issue is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (citing Hudson, 503 U.S. at 7) (internal quotation marks omitted); Furnace v. Sullivan, 705 F.3d 1021, 1028 (9th Cir. 2013).  The objective component of an Eighth Amendment claim is contextual and responsive to contemporary standards of decency, Hudson, 503 U.S. at 8 (quotation marks and citation omitted), and although *de minimis* uses of force do not violate the Constitution, the malicious and sadistic use of force to cause harm always violates contemporary standards of decency, regardless of whether or not significant injury is evident, Wilkins, 559 U.S. at 37-38 (citing Hudson, 503 U.S. at 9-10) (quotation marks omitted); Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002).

A prisoner's rights can be violated by a prison official's deliberate indifference by failing to intervene.  Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995).  Prison officials are required "to take reasonable steps to protect inmates from physical abuse."  Hoptowit v. Ray, 682 F.2d 1237, 1250 (9th Cir. 1982) (abrogated on other grounds by Sandin v. O'Connor, 515 U.S. 472 (1995)).  To state a claim the plaintiff must show that the defendants acted with deliberate indifference.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (citations omitted).  Deliberate indifference requires a showing that "prison officials were aware of a "substantial risk of serious harm" to an inmates health or safety and that there was no "reasonable justification for the deprivation, in spite of that risk."  Id. (quoting Farmer v. Brennan , 511 U.S. 825, 837, 844 (1994)).  Additionally, an officer can only be

held liable for failing to intercede if he had a realistic opportunity to intercede and failed to do so. Cunningham v. Gates, 229 F.3d 1271, 1289-90 (9th Cir. 2000).

There is no dispute that on April 9, 2007, Nicholas and Holguin participated in a series of cell searches in Housing Unit 3, Section B.  Holguin and Nicholas were searching for contraband, including inmate manufactured weapons, and evidence that prison gangs or disruptive groups were planning violence against staff or other inmates.  Holguin and Nicholas knew that inmates can keep notes in their cells regarding plans to commit acts of violence, and the identities of intended victims. Inmates who are not members of prison gangs or disruptive groups are also called upon to keep notes. Before staff arrived at cell 102, Plaintiff and Garner could hear staff running toward their cell.

The parties version of events that occurred immediately after Defendants Nicholas and Holguin arrived at Plaintiff's cell are disputed.

### 1).     Defendant Nicholas and Holguin's Version of Facts

Defendants Nicholas and Holguin contend that as they approached cell 102 (Plaintiff and inmate Garner's cell), they saw inmate Garner flushing unidentified items down the toilet.  Holguin and Nicholas ordered inmate Garner to stop what he was doing and get down on the ground.  Garner ignored the orders and continued to flush the unidentified items down the toilet.  Holguin and Nicholas believed that Garner was disposing of contraband, including information that prison officials needed to protect the lives of other inmates and staff, but they could not determine specifically what contraband Garner was flushing.

Because Garner refused to comply with repeated orders to stop flushing items down the toilet and get down on the ground, Nicholas and Holguin simultaneously drew and deployed their O.C. pepper spray canisters.  Each deployed an eight to ten second burst of spray to the face and upper torso of inmate Garner in an attempt to gain control of the situation and prevent Garner from continuing to dispose of the unidentified contraband.  As Nicholas and Holguin were spraying, they both continued to order Garner to stop what he was doing, and for both Plaintiff and Garner to get down on the ground.  Inmate Garner returned to the locker where the pruno was stored, retrieved another bag, and dumped it into the toilet.

During this time, Plaintiff was sitting on his bunk toward the back of the cell. Nicholas and Holguin were spraying inmate Garner, Plaintiff could hear staff yelling, "Cuff up. Get down." Plaintiff did not get down on the ground. Instead, he "froze."

Garner eventually stopped flushing the bags and ran toward Plaintiff at the back of the cell. Plaintiff was first exposed to O.C. pepper spray when Nicholas and Holguin were attempting to spray inmate Garner as he ran toward Plaintiff. Plaintiff "didn't register" that staff were ordering him to get down on the ground until he was exposed to O.C. pepper spray.

When inmate Garner reached the back of the cell, Garner realized that he did not have anywhere else to run, then he turned and hid beneath the locker. Staff continued to order Plaintiff and Garner to get down on the ground, and then submit to the application of handcuffs at the cell door. Garner refused to comply with these orders, and he continued to hide under the locker, while Plaintiff got down on the ground. Neither inmate approached the cell door to permit staff to secure them in handcuffs. Plaintiff does not recall how many times he was ordered to "cuff up."

A T-16 O.C. pepper spray grenade disperses the same type of O.C. pepper spray as a canister, but does so more broadly. Holguin did not believe the T-16 round was a risk to Garner or Plaintiff's safety, but rather Holguin believed the T-16 round was necessary to quickly and safely expose inmate Garner and Plaintiff to O.C. pepper spray and compel them to stop what they were doing, come to the cell door, and be restrained. Thus, Holguin deployed a T-16 round into cell 102. Plaintiff was exposed to O.C. pepper spray for approximately two or three minutes before he exited his cell.

**2).    Plaintiff's Version of Facts**

Plaintiff contends that at 9:20 a.m. on April 9, 2007, upon arriving at Plaintiff's cell door, Defendants Nicholas and Holguin opened the tray slot to Plaintiff's cell and without warning immediately began spraying pepper spray into the cell. During this time, they were simultaneously issuing orders for Plaintiff's cellmate (Garner) to get down. Plaintiff was sitting on his bunk in the back of the cell doing nothing wrong.

Garner was attempting to dump out pruno kicker into the toilet. The bags of kicker were on Garner's shelf. Plaintiff did nothing to assist Garner in disposing of the kicker. Garner dumped the contends of the bag of kicker into the toilet then took 1 ½ steps towards the back of the cell, turned

around and dove on the ground underneath his locker.  Plaintiff contends that Defendants Nicholas and Holguin could see the kicker pulp on the rim of the toilet.  The lockers are situated approximately 3 ½ to 4 feet above the ground level and are mounted to the right side wall.  The space underneath the lockers is unobstructed from view when looking into the cell through the window on the door from outside the cell. Plaintiff had no reason to get down because the defendants were pepper spraying Garner and Plaintiff was not engaged in any misconduct.

After Garner dove to the ground Defendants Nicholas and Holguin began to pepper spray Plaintiff.  While Plaintiff was being pepper sprayed he heard the Defendants issue an order to get down and cuff up.  Defendants never addressed Plaintiff by name.  Plaintiff immediately got down while being pepper sprayed but the Defendants continued to spray him and did not give Plaintiff an opportunity to cuff up.  While lying on the ground, Defendants Nicholas and Holguin continued to pepper spray Plaintiff and again did not give him a change to cuff up.  Immediately after Nicholas and Holguin finished using their MC9 O.C. streamers on Plaintiff, they slammed the tray slot closed, opened it back up and threw a T-16 (particulate) grenade into Plaintiff's cell.

After deploying the T-16 grenade into the cell, and closing the tray slot, neither of the Defendants reopened the tray slot to provide Plaintiff and Garner an opportunity to submit to cuffs.  Instead, the Defendants let Plaintiff and Garner marinate in the combined chemical soup for two to three minutes.  The intensity of the burning from the combined chemicals were so severe that Plaintiff couldn't breathe, Plaintiff could not see, Plaintiff's skin felt like it was melting.

**3).     Denial of Summary Judgment for Defendants Nicholas and Holguin**

If Plaintiff's version of the facts are believed, there is genuine issue of material fact as to whether Defendants Nicholas and Holguin used excessive force by dispensing a eight to ten second burst of pepper spray and a subsequent T-16 grenade.  A factual dispute exists as to whether the amount of pepper spray used to extract Plaintiff was an excessive use of force.

Plaintiff's second amended complaint, he contends that Defendant Nicholas went to location of Plaintiff's holding cell and told him "next time I'm going to shoot one of you mother fuckers."  (2nd Amd. Compl. at p. 10 ¶ 56.)  Based on this statement, Plaintiff contends he is certain that the chemical force used, was done so with the sole purpose of inflicting harm and pain for no other reason than to

satisfy overflowing hostilities toward Black inmates.  (Id.)   If the officers use of force is so disproportionate to that required that it suggests deliberate sadism, the use of force violates the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 322 (1986).   Accordingly, Defendants Nicholas and Holguin are not entitled to summary judgment and their motion should be denied.

### c.    Defendant Ortega

It is undisputed that Defendant Ortega was present during the cell search/extraction on April 9, 2007.

### 1).    Plaintiff's Version of Facts

Plaintiff contends that he heard Defendant Ortega issue an order for Defendant Holguin to deploy a T-16 grenade bomb into Plaintiff's cell, despite the fact that Plaintiff and his cellmate were proned out on the floor.  Plaintiff further contends that Defendant Ortega stood there and did nothing to prevent the unnecessary use of force by Defendants Holguin and Nicholas.

### 2).    Defendant Ortega's Version of Facts

Defendant Ortega declares that on April 9, 2007, he observed Defendants Nicholas and Holguin's interaction with Plaintiff and Garner and provided additional security and support.  Ortega declares that he did not use any force, nor did he see the other officers use any force intended to injure Plaintiff.  Ortega believed the force used by Nicholas and Holguin was necessary to gain control of the situation and prevent Garner from continuing to dispose of the unidentified contraband.  Ortega did not believe the O.C. pepper spray posed a risk to Plaintiff's safety.

### 3).    Denial of Summary Judgment for Defendant Ortega

Based on Plaintiff's version of the facts, if believed, there is a genuine issue of fact as to whether Defendant Ortega failed to intervene during the use of excessive force by Defendants Nicholas and Holguin.

In order to state an excessive force claim against correctional officer-bystanders, a plaintiff must allege circumstances demonstrating that these officers had an opportunity to intervene and prevent or curtail the violation, but failed to do.  Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995).  In other words, the plaintiff must show that the defendant-bystander had enough time to observe what was happening and to intervene and stop it.  Id.  A defendant is liable for failing to

intervene where there is an underlying constitutional violation, as here, warranting intervention.  The failure to intervene is a theory of liability that derives meaning from the underlying violation (here, excessive force), not a separate claim.  Lynch v. Barrett, No. 09-cv-00405-JLK-MEH, 2010 WL 3938359, at 4-5 (D. Colo. June 9, 2010).  Accordingly, Defendant Ortega is not entitled to summary judgment and his motion should be denied.

       3.     Defendants Machado and Juden

It is undisputed that Defendants Machado, and Juden were present at some point in time during the cell search/extraction on April 9, 2007.

It is undisputed that Defendants Machado and Juden were not present during use of chemical force, and had no realistic opportunity that could have intervened.  Thus, there is no cognizable claim for failure to protect against Defendants Machado and Juden.  See Robins v. Meecham, 60 F.3d at 1442.

Machado declares that he arrived at Housing Unit 3, Section B, cell 102 after the O.C. pepper spray had been utilized.  Machado observed inmates Garner and Plaintiff exit cell 102 and officer J. Juden secure them in restraints.  Machado does not recall anyone dragging Plaintiff on April 9, 2007.

Juden declares that he did not observe anyone use any O.C. pepper spray during the subject incident with Plaintiff on April 9, 2007.  Juden arrived at Housing Unit 3, Section B, cell 102, after the O.C. pepper spray was used.

Juden observed Defendant Machado order Plaintiff and inmate Garner to get down on the ground and exit the cell.  After Garner exited the cell, Juden secured him in leg irons and handcuffs.  Plaintiff crawled backward out of the cell, and Juden secured him in leg irons and handcuffs.  Juden does not recall anyone dragging Plaintiff on April 9, 2007.

Plaintiff contends that at 9:23 a.m on April 9, 2007, while Plaintiff was crawling backwards outside of the cell as ordered, Defendants Machado and Juden grabbed Plaintiff's ankles and drug him out of the cell and onto the tier, scraping the skin off both of Plaintiff's knees.  Neither Plaintiff nor Garner presented any threat to the Defendants.  Defendant Juden placed Plaintiff in restraints.

Although Defendants present and argue that an unidentified non-Defendant moved Plaintiff out of the doorway, based on Plaintiff's allegations both in his second amended complaint and opposition,

22

it was Defendants Machado and Juden who engaged in such conduct.  Indeed, in Plaintiff's second amended complaint, Plaintiff alleges, in relevant part, "Approximately two minutes after the pepper spray and T-16 grenade had been deployed into plaintiff's cell and on plaintiff's person, as if coming from a great distance, plaintiff heard defendant L. Machado say 'take off your cloths and crawl backwards toward the door.  Plaintiff is unaware if the order was issued to plaintiff or plaintiff's cellmate because plaintiff was dismayed, was having extreme difficulty breathing, couldn't see, was severely burning and was extremely disoriented.  However, plaintiff immediately complied and took off plaintiff's cloths and immediately crawled backwards towards the cell door.  As plaintiff reached the cell door, defendants L. Machado and J. Juden grabbed plaintiff's ankles and drug plaintiff out onto the tier-scraping the skin off both of plaintiff's knees in the process.  (2nd Amd. Compl. at ¶¶ 53-55.)  The medical examination by Defendant Bubbel, Licensed Nurse, following the incident noted "minor scrapes to knees."  (Decl. of Bubbel, at Ex. A.)

The fact that neither Defendant Machado nor Juden recall anyone dragging Plaintiff from his cell and deny doing so themselves, a genuine issue of material fact exists as to whether excessive force was used by them when moving Plaintiff out of his cell.  At summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party; if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  Accordingly, Defendants Machado and Juden are not entitled to summary judgment and their motion should be denied.

> 2.     Deliberate Indifference to Serious Medical Need

There is no dispute that the use of pepper spray constitutes a serious medical need.  The issue in this case turns on whether the decision to provide one type of decontamination over another constitutes deliberate indifference.

Plaintiff's claims against Defendants Adame, Bubbel, Coontz, Crouch, Knight, Large, Pinkerton, Prior, Rivera, Soto, Tyree, Valverde, Velasco, Vo, Worrell, and Yuberta relate to: (1) whether air decontamination is medically appropriate for exposure to O.C. pepper spray; (2) whether Adame and Rivera provided Plaintiff with air decontamination; (3) whether Defendants are entitled to

1   qualified immunity because they could have reasonably believed that Plaintiff was provided proper

2   decontamination; and (4) whether Defendants refused to provide any decontamination upon Plaintiff's

3   arrival in the Administrative Segregation Unit.

4           a.      **Defendants Adame and Rivera**

5           The undisputed facts demonstrate that Plaintiff was escorted out of the Housing Unit Three,

6   Section B.  Defendants Adame and Rivera, arrived approximately fifteen minutes outside the Housing

7   Unit Three to escort Plaintiff to a holding cell in the medical clinic.  Defendants Adame and Rivera

8   declare that when they arrived at the scene, Plaintiff was not coughing, gagging, or short or breath

9   when Adame and Rivera observed him.  Plaintiff told Adame and Rivera, "They ain't give me no

10  decontamination, man.  This stuff is still burning me.  Man, I need some decontamination.  Somebody

11  do something."  Other than the burning sensation to his skin, Plaintiff did not advise Adame or Rivera

12  that he was having any adverse reactions to the pepper spray.

13          Plaintiff contends that he requested decontamination from Defendants Adame and Rivera due

14  to the adverse effects of the combined chemical agents, but they ignored him.  Prior to placing

15  Plaintiff into the clinic holding cell, Defendants Adame and Rivera looked into the cell from outside to

16  ensure it was clear then placed Plaintiff into it.  It took approximately 1 ½ minutes for Defendants

17  Adame and Rivera to briskly escort Plaintiff from outside the Housing Unit 3 to the 4A clinic holding

18  cell, which is approximately fifty yards.  Plaintiff contends that from the time he was brought outside

19  of Housing Unit 3 until his escort to the 4A clinic, it was hot and stifling outside with no moving or

20  flowing air or wind.  After escort to the clinic holding cell, Plaintiff discovered the sink was clogged

21  and there was no access to fresh running water.  Both Plaintiff and his cellmate Garner informed all

22  staff who entered the building that they were in need of decontamination and the sink was clogged.

23  Neither Adame or Rivera provided Plaintiff with any decontamination, nor notify any staff in the

24  administrative segregation unit that Plaintiff was in need of a decontamination shower.

25          Defendants submit evidence that the California Correctional Institution's decontamination

26  policy, as applicable in April 2007, states that individuals exposed to o.c. pepper spray may be

27  decontaminated with either exposure to fresh air or by flushing the affected body areas with cool

28  water.  (Declaration of K. Prior at ¶ 4, Ex. A, ECF No. 123-5.)  In this instance, Plaintiff was allowed

24

to remain in the fresh air for approximately fifteen minutes, and was then escorted from the outside of Housing Unit 3, Section B to the clinic holding area which required additional travel outside for several minutes.  (Id. at  ¶ 12; Declaration of Adame at ¶ 10; Declaration of Rivera at ¶ 10.)  Adame and Rivera believed that Plaintiff was provided proper air decontamination before he arrived in the clinic holding area.  (Declaration of Adame at ¶¶ 9, 10; Declaration of Rivera at ¶¶ 9, 10.)

Defendants Adame and Rivera placed Plaintiff in holding cell number 122.  There is a sink inside holding cell 122, which was clogged with brown water.  However, at the time Adame and Rivera placed Plaintiff in the holding cell, they believed that the sink inside the cell was working properly, and Plaintiff had cool running water available to him from the faucet.  (Declaration of Adame at ¶ 11; Declaration of Rivera at ¶ 11.)  Furthermore, Plaintiff did not advise Defendants Adame or Rivera that the sink inside his holding cell was clogged.  (Pl's Depo. 136:24-137:11, 139:1-7.)

Defendants Adame and Rivera also believed that staff inside Plaintiff's new building would provide him with the opportunity to wash up upon being rehoused.  (Declaration of Adame at ¶ 12; Declaration of Rivera, at ¶ 12.)  After he left the clinic holding area, Defendant Adame did not have any personal knowledge of how long Plaintiff occupied the holding cell, but he did not believe, or have any reason to believe, that anyone would fail to provide additional decontamination to Plaintiff, if necessary.  (Declaration of Adame at ¶¶ 2, 13; Declaration of Rivera at ¶ 12.)

Based upon this evidence, Plaintiff has failed to demonstrate a genuine issue of material fact that either Defendant Adame or Rivera knew of and disregarded an excessive risk to his serious medical condition.  While Plaintiff states Defendants Adame and Rivera failed to provide requested decontamination, he fails to set forth facts to show why it would be obvious that the decontamination was insufficient.  Plaintiff's complaint merely states the sink was clogged and he was severely burning, which is consistent with exposure to pepper spray and fails to show that he was at risk of serious harm.  Plaintiff's conclusory statement that the defendants were aware that additional decontamination was needed is insufficient to show that Defendant Adame and/or Rivera were aware he was at risk of serious harm and failed to act in response.  Thomas v. Ponder, 611 F.3d at 1150.  Defendants Adame and Rivera had no contact with Plaintiff after they were escorted to the holding

cell, and therefore had no knowledge that Plaintiff was not further decontaminated.  There is no indication that Defendants knew that failing to further decontaminate Plaintiff would subject him to a substantial risk of injury.  Accordingly, based on the undisputed evidence, Plaintiff cannot establish that he was subjected to deliberate indifference to a serious medical need and summary judgment should be granted in favor of Defendants Adame and Rivera.

### b.    Defendants Bubbel and Vo

#### 1).    Plaintiff's Version of Facts

As to Defendant Medical Technical Assistant Bubbel, Plaintiff contends that at 9:25 a.m. on April 9, 2007, he was medically assessed for Administrative Segregation Unit placement by Defendant Bubbel.  Plaintiff complained to Defendant Bubbel that he was in need of decontamination but Bubbel ignored his request.  Plaintiff contends that Bubbel conducted a visual assessment of Plaintiff while outside the holding cell by looking through a glass window.  Bubbel noted the scraped skin off of Plaintiff's knees.  Bubbel never entered the holding cell to determine if there was access to fresh water in the sink.

As to Defendant Medical Doctor, Vo, Plaintiff contends when he entered the clinic holding area, Plaintiff advised him that he swallowed pepper spray and felt sick.  Plaintiff informed Defendant Vo that it felt like his skin was melting and he was in need of decontamination and medical attention.  Defendant Vo stated that it did not look like Plaintiff's skin was melting and walked away without providing decontamination or medical care.  Plaintiff contends that Doctor Vo did not enter the holding cell to determine if there was access to fresh water in the sink.

#### 2).    Defendant Bubbel's Version of Facts

Defendant Bubbel contends that on April 9, 2007, he was assigned to report to the 4A clinic holding area to examine several inmates, including Plaintiff, for exposure to O.C. pepper spray.  Prior to the examination, Bubbel was advised that Plaintiff was exposed to O.C. pepper spray at approximately 9:00 a.m.  Bubbel examined Plaintiff for approximately five minutes at approximately 9:25 a.m.  Plaintiff told Bubbel, "Man, we've been sprayed with this pepper spray.  Man, we need some decontamination.  Man, this stuff is burning."

Bubbel declares that on April 9, 2007, he was aware that Plaintiff was outside from Housing Unit 3 to the clinic holding area for several minutes.  Thus, Bubbel believed that Plaintiff had already been provided sufficient air decontamination before the examination.  (Declaration of Bubbel, at ¶¶ 5-11.)  Because it is not uncommon for an individual to experience burning for up to forty-five minutes prior to the examination, Bubbel did not consider Plaintiff's complaints to be unusual or the basis for any further medical treatment.  (Id. at ¶ 14.)

Bubbel observed that Plaintiff was not having any problem breathing, other respiratory distress, or skin irritation.  (Id. at ¶¶ 14, 17.)  Bubbel observed that Plaintiff had minor scrapes to both knees, but no other injuries.  (Id.)  Based upon his examination, Bubbel did not believe that Plaintiff required any further treatment.  (Id. at ¶ 14.)

At all times relevant to this suit, Bubbel believed the sink inside the holding cell was working, and that Plaintiff had access to cool running water.  (Id. at ¶ 15.)  Plaintiff did not advise Bubbel that the sink inside his holding cell was clogged, and during the examination Bubbel did not notice any discoloration to Plaintiff's skin.  (Pl's Depo. at 139:15-17; 142:24-143:3.)

### 3).     Defendant Vo's Version of Facts

Dr. Vo did not refuse to decontaminate Plaintiff for exposure to O.C. pepper spray.  (Declaration of Vo, at ¶¶ 3-7.)  Shortly after Plaintiff was examined by Bubbel, Plaintiff told Vo that he hadn't been decontaminated, that the stuff was burning.  Plaintiff told Dr. Vo "I felt sick because I had swallowed some of the pepper spray.  I told him that it felt like my skin was melting."  (Pl's Depo. at 155:17-20; ECF No. 21  ¶¶ 76-77.)   Dr. Vo believed that Plaintiff was provided proper air decontamination before he arrived in the clinic holding area.  (Declaration of Vo, at ¶¶ 3-7.)

### 4).     Summary Judgment in Favor of Defendants Bubbel and Vo

Defendants Bubbel and Vo are entitled to summary judgment on this claim.  Plaintiff presents no evidence that either Bubbel or Vo were deliberately indifferent to a serious medical need.

Although Plaintiff complains generally that he was in need of further decontamination, the undisputed evidence demonstrates that Defendant Bubbel conducted a visual examination of Plaintiff for approximately five minutes just twenty-five minutes after the use of the pepper spray.  During the examination, Plaintiff was not having any breathing, respiratory distress, or skin irritation.  Although

1    Bubbel observed minor scratches on Plaintiff's knees, there were no other injuries and further medical

2    treatment was not necessary.

3         Plaintiff fails to show how Defendant Bubbel's evaluation amounted to deliberate indifference.

4    Although Plaintiff now claims that Defendant Bubbel did not conduct an actual visual examination but

5    only while outside the holding cell and through a glass window.  Plaintiff's contention is refused by

6    his deposition testimony, in which he admitted that Defendant Bubbel performed "a whole body check

7    thing, that whole type of stuff."  (Pl's Depo. at 132:20-22.)  Defendant Bubbel "look at the stuff on my

8    knees, you know, did a visual."  (Id. at 133:1.)   Indeed, Plaintiff fully acknowledged that MTA

9    Bubbel went into the holding cell to exam Plaintiff.  (Id. at 134:4-6.)

10         Plaintiff's self-serving and speculative assertion, contrary to his deposition testimony, fails to

11   create a genuine dispute for trial, as it is nothing more than a sham attempt to defeat summary

12   judgment.  See Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266-267 (9th Cir. 1991) ("The general

13   rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his

14   prior deposition testimony.")  Moreover, Defendant Bubbel's medical report confirms his visual

15   examination of Plaintiff, where he noted minor scrapes to Plaintiff's knees and indicated that he

16   completed a physical assessment of Plaintiff and he complained only of the O.C. pepper spray with no

17   other injuries, and instructions on decontamination were provided.  (Declaration of Bubbel, Ex. A.)

18   Furthermore, Plaintiff fails to submit any other evidence to support his statement or to otherwise create

19   a triable issue as to whether Defendant Bubbel was deliberately indifferent for failure to provide

20   medical treatment.

21         With regard to Defendant Doctor Vo, although Plaintiff contends that he informed Doctor Vo

22   that he felt his skin was melting, to which Doctor Vo disagreed, Plaintiff's disagreement about

23   whether he was in need of immediate further decontamination with water is a disagreement with the

24   course of treatment, that does not show deliberate indifference under the Eighth Amendment.  Jackson

25   v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.

26   1981).

27         Plaintiff contends that in 2003, he was diagnosed with a medical condition known as anti-

28   nuclear antibodies (ANA) production where his immune system is producing antibodies that are

28

attacking itself and Plaintiff.  Plaintiff has also been diagnosed with an abnormally low platelet count, which Plaintiff believes contributed to the prolonged adverse reaction to the chemical agents.  (Opp'n at pp. 12-13.)

Although Plaintiff contends in 2003 he was diagnosed with anti-nuclear antibodies, beyond Plaintiff's mere contention, he fails to submit any medical evidence to support such conclusion, and Plaintiff's deposition testimony contradicts such contention.  (See Pl's Depo. 106:8-10, 109:17-19, 110:4-6, where Plaintiff denied any medical problems that would impact how pepper spray would affect him.)  Even if Plaintiff's allegation is true relating to his medical condition he provides no evidence that any Defendant knew about his condition before they used pepper spray and/or failed to decontaminate him.  To the extent that Plaintiff contends that Defendants should have investigated his medical history, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot … be condemned as the infliction of punishment" so as to violate the Eighth Amendment.  Farmer, 511 U.S. at 838.  Accordingly, summary judgment should be granted in favor of Defendants Bubbel and Vo.

### c.    Defendants Crouch and Tyree

### 1).    Plaintiff's Version of the Facts

Plaintiff contends that prior to Defendant Tyree and Crouch arriving at the 4A clinic holding cell, Plaintiff may have inadvertently smudged some of the chemicals off of part of his chest and face while sitting on top of the bench (inside the holding cell) naked.  At one point Plaintiff became so desperate to relieve some of the burning from Plaintiff's eyes and face by using the rancid and fetid toilet water because the sink was clogged.  Defendants Tyree and Crouch never entered into the holding cell to determine if Plaintiff had access to fresh water.  Defendant Tyree and Crouch interviewed Plaintiff and took pictures about gang stuff.  Approximately one and one-half hours after Plaintiff was exposed to the chemical agents Tyree and Crouch took pictures of Plaintiff while majority of Plaintiff's body was still saturated with the chemical agents used on Plaintiff.  While being interviewed by Defendant Crouch and Tyree, Plaintiff requested decontamination, and Plaintiff's cellmate Garner informed Crouch and Tyree that the sink in the holding cell was clogged.

### 2).   Defendants' Version of the Facts

Defendants Tyree and Crouch took photographs of inmates in the clinic holding area to document both the presence and absence of gang tattoos.   (Declaration of Tyree, at ¶ 10.)  While inside the holding cell, Plaintiff washed the O.C. pepper spray residue off his face and most of his chest.  (Id. at ¶ 11, Ex. A; Declaration of Crouch, at ¶ 11, Ex. A.)

Plaintiff told Tyree, "We was still burning from the pepper spray, and that we hadn't been decontaminated, that we needed decontamination."  Tyree believed that Plaintiff was provided proper air decontamination before he arrived in the clinic holding area.  When Plaintiff spoke to Tyree, his skin was not discolored.  At all times relevant to this suit, Tyree believed the sink inside holding cell 122 was working properly, and Plaintiff had cool running water available to him from the faucet.  Plaintiff did not advise Tyree that the sink inside his holding cell was clogged.

Crouch believed that Plaintiff was provided proper decontamination before he arrived in the clinic holding area.  When Plaintiff spoke to Crouch, his skin was not discolored.  At all times relevant to this  suit, Crouch believed the sink inside holding cell 122 was working properly, and Plaintiff had cool running water available to him from the faucet.  Plaintiff did not advise Crouch that the sink inside his holding cell was clogged.

### 3).   Summary Judgment in Favor of Defendants Tyree and Crouch

Based upon this evidence, Plaintiff has failed to demonstrate a genuine issue of material fact that either Defendant Tyree or Crouch knew of and disregarded an excessive risk to his serious medical condition.  While Plaintiff states Defendants Tyree and Crouch failed to provide requested decontamination, he fails to set forth facts to show why it would be obvious that the decontamination was insufficient.  Plaintiff's complaint merely states the sink was clogged and he was severely burning, which is consistent with exposure to pepper spray and fails to show that he was at risk of serious harm.  Plaintiff's conclusory statement that the defendants were aware that additional decontamination was needed is insufficient to show that Defendant Tyree and/or Crouch were aware he was at risk of serious harm and failed to act in response.  Thomas, 611 F.3d at 1150.  Defendants Tyree and Crouch believed that Plaintiff was provided proper air decontamination and his skin was not discolored.  In addition, Plaintiff had washed off some of the o.c. pepper spray residue, and they had

not knowledge that Plaintiff did not have cool running water available to him from the faucet. There

is no indication that Defendants knew that failing to further decontaminate Plaintiff would subject him

to a substantial risk of injury.

   Although Plaintiff contends that his cellmate Garner informed Defendants Tyree and Crouch

that the sink in the holding cell was clogged, even assuming the truth of such assertion, this does not

create a genuine issue of material fact. Testimony by Plaintiff's cellmate is inadmissible hearsay and

cannot be used to create a dispute of fact. Fed. R. Civ. P. 56(c); Stillwell v. RadioShack Corp., 676

F.Supp.2d 962, 979 (S.D. Cal. 2009) (hearsay statements do not meet plaintiff's burden of producing

admissible evidence that creates a dispute of material fact).   Accordingly, based on the undisputed

evidence, Plaintiff cannot establish that he was subjected to deliberate indifference to a serious

medical need and summary judgment should be granted in favor of Defendants Tyree and Crouch.

   **d.     Defendants Knight, Large, Pinkerton, Prior, Soto, Valverde, Worrell, Yubeta, and Cootnz**

   **1).     Plaintiff's Version of Facts**

   As to Defendant Knight, Plaintiff contends he saw him enter the clinic holding area, and

Plaintiff informed Knight that he had not been decontaminated. Defendant Knight was also informed

that the sink in the holding cell was clogged and Plaintiff had no access to fresh water. Knight did not

enter the holding cell to determine if he had access to fresh water.

   As to Defendant Pinkerton, Plaintiff contends when he entered the clinic holding area, Plaintiff

informed him that he had not been decontaminated and was in need of medical attention. Pinkerton

was informed that the sink in the holding cell was clogged and Plaintiff had not access to fresh water.

Pinkerton never entered Plaintiff's holding cell or provided any decontamination.

   As to Defendant Prior, Plaintiff contends when he entered the clinic holding area, Plaintiff

informed him he was in need of decontamination and medical attention. Prior gave Plaintiff a pair of

paper undershorts and denied Plaintiff's request for decontamination or medical attention. Prior was

informed that the sink in the holding cell was clogged. Prior told Plaintiff that he would receive a

shower when he arrived at the Administrative Segregation Unit (ASU). Prior did nothing to ensure

that Plaintiff was afforded decontamination upon his arrival at the ASU. Prior never entered the

holding cell to determine if there was access to fresh water in the sink.  Upon Plaintiff's arrival at the ASU, twelve hours after being exposed to the chemical agents, Plaintiff was denied a decontamination shower to wash the combined chemicals off of his body.  Plaintiff may have inadvertently smudged some of the combined chemicals off of some of his chest and face, Plaintiff had to use the rancid water in the toilet to relive the burning in his eyes and face.

As to Defendant Cootnz, Plaintiff contends that when he entered the clinic holding area, Plaintiff informed him that the sink was clogged.  Defendant Cootnz ignored Plaintiff's request for decontamination and never entered the holding cell to determine if there was fresh running water in the sink.

As to Defendants Large, Soto, Worrell, and Yubeta, Plaintiff contends that upon seeing them enter the clinic holding area, as Plaintiff and other inmates yelled for assistance, Plaintiff informed the Defendants that he needed decontamination and medical attention, and his skin was discolored and the sink was clogged.  The defendants asked why Plaintiff was in the holding cell naked and screaming for help.  After learning that Plaintiff was suffering from the effects of the chemical agents, Sergeant Soto advised Plaintiff to have his cellie wash his backside using the toilet water, then Defendants left and ignored Plaintiff's requests for decontamination.  Large, Yuberta, Worrell, and Soto never entered Plaintiff's holding cell to determine if Plaintiff had access to fresh water.  Plaintiff used toilet water to try to relieve the burning in Plaintiff's eyes and face.  Plaintiff inadvertently smudged part of the chemical agents off of his chest and face when he pulled his knees to his chest while sitting atop of the holding cell benches trying to conceal his nakedness.

**2).   Defendants' Version of Facts**

Each of these Defendants submit personal declarations in which each declares that they have no recollection of any interaction with Plaintiff on April 9, 2007.   (Exs. 4, 8, 9, 13, 14, 16, 18, 21, 22, Declarations of Knight, Large, Pinkerton, Prior, Soto, Valverde, Worrell, Yubeta, and Cootnz.)  However, if these Defendants had been advised by Plaintiff "that he was exposed to o.c. pepper spray in his housing unit and the responding staff failed to decontaminate him prior to placement in the clinic holding area, each Defendant declares that "[i]t is impossible to travel between housing unit three at CCI, where Plaintiff resided on April 9, 2007, and the clinic holding area, without traveling

32

outside for several minutes, which should have constituted sufficient air decontamination to exposure of the o.c. pepper spray."  (Id.)  Thus, each Defendant "would have understood [Plaintiff's] purported statement to be his lay opinion that he did not consider air decontamination to be an acceptable alternative to water decontamination."  (Id.)

### 3).   Summary Judgment in Favor of Defendants Knight, Large, Pinkerton, Prior, Soto, Valverde, Worrell, Yubeta, and Cootnz

Plaintiff's conclusory claims do not overcome the evidence submitted by Defendants by way of their declarations that they have no recollection of any interaction with Plaintiff on April 9, 2007. Plaintiff presents no evidence that any of these Defendants engaged in any specific conduct giving rise to a claim of deliberate indifference to a serious medical need.  Each Defendant declares that

Even viewing the evidence in the light most favorable to Plaintiff and assuming the truth of his allegations, the only evidence before the Court demonstrates that these Defendants believed, or would have believed, that Plaintiff was provided proper air decontamination prior to placement in the clinic holding cell, and Defendants cannot be held liable for deliberate indifference if they were not aware of the risk of serious harm.  See Farmer, 511 U.S. at 837.  Plaintiff, who admits to wiping some of the pepper spray off before any contact with these Defendants, does not submit any evidence showing that Defendants were deliberately indifference by failing to provide further decontamination.  There is no evidence from which it can be inferred that Defendants Knight, Large, Pinkerton, Prior, Soto, Valverde, Worrell, Yubeta, and Cootnz would have known that further decontamination was necessary at that point in time, and summary judgment should be granted in their favor on the issue of deliberate indifference to a serious medical need.

### e.   Defendant Velasco

Defendant Velasco declares, in part, that "[b]etween April 9, 2007, and April 19, 2007, [he] did not refuse to decontaminate inmate [Plaintiff] for exposure to o.c. pepper spray.  I was not aware of anyone that failed to properly decontaminate [Plaintiff], and [he] did not believe, or have any reason to believe, that anyone would refuse to properly decontaminate [Plaintiff].  (Decl. at ¶ 2.)  Further, "[Plaintiff] had cool running water available to him from the faucet located inside his holding cell.  To the best of [his] knowledge, the faucet and sink in the clinic holding cell were working properly on

33

April 9, 2007.  [He did] not believe, or have any reason to believe, that the faucet and sink in the clinic holding cell that [Plaintiff] occupied were not working properly on April 9, 2007."  (Id. at ¶ 9.)

Plaintiff alleges (by way of verified complaint and opposition) that Defendant Velasco was in the clinic control observation booth, observed Plaintiff naked in the cell screaming, crying and pleading for decontamination and medical attention due to the adverse reaction Plaintiff was having from prolonged exposure to the combined chemical agents.  While in the clinic holding area Plaintiff informed Velasco that he was in need of decontamination and Velasco was informed that the sink was clogged inside Plaintiff's holding cell.  Velasco observed Plaintiff use fetid toilet water desperate to wash the chemical agents out of Plaintiff's eyes.  Velasco laughed at Plaintiff and taunted him stating, "Hey, which one of you is Holt … It burns huh?"  Velasco continued to laugh at Plaintiff and ignored his requests for medical attention.  (Opp'n at 15; 2nd Amd. Compl. at 15 (identified then as "Doe 7").)

Beyond Defendant Velasco's bare declaration that he did not refuse Plaintiff's decontamination between April 9, 2007, and April 19, 2007, and belief that Plaintiff had a working sink and faucet with running water, Defendant Velasco does not address Plaintiff's specific claim that he taunted Plaintiff after the use of pepper spray, which creates a genuine issue of material fact as to whether Defendant Velasco acted with deliberate indifference or malicious or sadistically for the very purpose of causing Plaintiff harm.  Therefore, Defendant Velasco is not entitled to summary judgment on this claim and his motion should be granted.

3.    Placement in Administrative Segregation

Between April 9, 2007, and April 19, 2007, Plaintiff did not encounter any of the named Defendants in the ASU at CCI.

Plaintiff claims that he continued to burn from the effect of the pepper spray until April 19, 2007, because Does 8 and 9 refused to provide him a shower upon his arrival in the administrative segregation unit, and after Plaintiff was provided a shower on April 10, 2007, Doe 10 knowingly refused to replace Plaintiff's bedding which was covered with pepper spray residue.  (ECF No. 21, ¶¶ 113-121.

To the extent defense counsel moves for summary judgment in favor of unidentified Doe Defendants, not yet served, counsel may not make an appearance on their behalf and move for

1  summary judgment in their favor.  In a separate order, the Court will address Plaintiff's claims against

2  unidentified and un-served Doe Defendants.  Thus, there is no basis to rule on Defendants' motion for

3  summary judgment as to this claim as it relates to unidentified and un-served Doe Defendants.

4       4.     <u>Claims for Injunctive Relief</u>

5       In his complaint, Plaintiff seeks an injunction requiring Defendants to implement a new policy

6  relating to the procedures relating to use of force and decontamination.  (ECF NO. 21 p. 44.)  Federal-

7  court jurisdiction requires the existence of a pending case or controversy.  U.S. Const. art III.  When

8  there no longer "'exists a present controversy as to which effective relief can be granted,'" the request

9  for relief is moot, "preempt[ing] any determination on the merits." <u>S.E.C. v. Gemstar-TV Guide Int'l,</u>

10 <u>Inc.</u>, 367 F.3d 1087, 1091 (9th Cir. 2004) (quoting <u>Village of Gambell v. Babbitt</u>, 999 F.2d 403, 406

11 (9th Cir. 1993)).

12      When an inmate seeks injunctive or declaratory relief concerning the prison where he is

13 incarcerated, his claims for such relief become moot when he is no longer subjected to those

14 conditions.  <u>Alvarez v. Hill</u>, 667 F.3d 1061, 1063-64 (9th Cir. 2012); <u>Nelson v. Heiss</u>, 271 F.3d 891,

15 897 (9th Cir. 2001); <u>Dilley v. Gunn</u>, 64 F.3d 1365, 1368 (9th Cir. 1995); <u>Johnson v. Moore</u>, 948 F.2d

16 517, 519 (9th Cir. 1991).

17      Plaintiff's claims for injunctive relief became moot when he transferred from CCI, and the

18 docket in this case reflects that Plaintiff is presently incarcerated at California State Prison – Los

19 Angeles.  The Defendants in this action do not work at California State Prison – Los Angeles, and they

20 do not have any authority or control over Plaintiff's day-to-day activities at the prison.  <u>See</u> <u>Johnson v.</u>

21 <u>Moore</u>, 948 F.2d 517, 519 (9th Cir. 1990) (holding that an inmate's transfer to another prison makes

22 his injunctive claims regarding the previous prison's practices moot).

23      An exception to the mootness rule applies in cases which are "capable of repetition yet evading

24 review." <u>Weinsten v. Bradford</u>, 423 U.S. 147, 149 (1975).  The exception applies where: (1) the

25 challenged action was too short in duration to be fully litigated before its cessation or expiration, or (2)

26 there is a reasonable expectation that the same complaining party would be subject to the same action

27 again.  <u>Murphy v. Hunt</u>, 455 U.S. 478, 482 (1982).  This reasonable expectation must be one of "real

28

and immediate" danger, not "conjectural or hypothetical."  City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983).

Neither exception applies here.  There is no indication, and certainly not a reasonable expectation, that Defendants will have any authority over Plaintiff, who is confined at California State Prison – Los Angeles.  There is also no indication that Plaintiff will be transferred back to CII, and the mere possibility that such a transfer may occur is insufficient to satisfy the mootness exception.  See Murphy, 455 U.S. at 482.  Therefore, Plaintiff claims for injunctive relief are moot and must be dismissed from the action.

## IV.

## RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that:

1.    Summary judgment be DENIED as to Defendants Nicholas, Holguin, Ortega, Machado, Juden, and Velasco; and

2.    Summary judgment be GRANTED as to Defendants Carrasco, Zanchi, Adame, Rivera, Valverde, Cootnz, Bubbel, Prior, Tyree, Large, Soto, Yuberta, Vo, Worrell, Knight, Crouch, and Pinkerton.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **January 27, 2015**

UNITED STATES MAGISTRATE JUDGE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28